Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6446 | **DATE** | 1/15/2004 |
| **CASE TITLE** | Nelson vs. Brinson Partners, Inc. et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due ____.
(3) ☐ Answer brief to motion due____. Reply to answer brief due____.
(4) ☐ Ruling/Hearing on ____ set for ____ at ____.
(5) ■ Status hearing set for 5/27/2004 at 9:30 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ____ set for ____ at ____.
(7) ☐ Trial[set for/re-set for] on ____ at ____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ____ at ____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Brinson's motion (Doc 2-1) to dismiss is denied. Defendants are given to January 29, 2004 to answer the complaint. All discovery to be completed by May 27, 2004.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JAN 1 6 2004 | 11 |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| SCT | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JAN 16 2004

JAMES NELSON, on behalf of himself and a )
class of persons similarly situated, )
)
Plaintiff, )
)
vs. ) 03 C 6446
)
BRINSON PARTNERS, INC. and BP AMOCO )
SAVINGS PLAN, )
)
Defendants. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendant Brinson Partners, Inc.'s ("Brinson") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is denied.

### BACKGROUND

Because this is a motion to dismiss, we accept all well pleaded facts and allegations in the complaint as true and construe all inferences in favor of the Plaintiff. Thompson v. Illinois Dep't of Prof'l Regulation, 300 F.3d 750, 753 (7th Cir. 2002).

Plaintiff James Nelson ("Nelson") is a former employee of BP Amoco Corporation ("BP"). Nelson was and is a participant in the BP Amoco Savings Plan

(the "Plan"), a 401(k)-type retirement plan that is an "employee pension benefit plan" within the meaning of the Employment Retirement Income Security Act ("ERISA"), § 3(2)(A), 29 U.S.C. § 1002(2)(A). Defendant Brinson is a global investment advisory firm based in Chicago. At all times relevant to this lawsuit Brinson acted as the investment manager for the Plan's assets pursuant to an agreement between BP's predecessor and Brinson known as the Investment Manager Agreement ("IMA"). The IMA granted Brinson "full discretionary authority to manage the assets" of the Plan.

As a BP employee participating in the Plan, Nelson had the opportunity to choose from over 200 investment options. Among those options was the Money Market Fund, the subject of this lawsuit, in which Nelson and other BP employees invested. The Money Market Fund was described in BP investment materials to Plan participants as a relatively safe investment option that sought to provide a short-term fixed income (also known as "money market") rate of return with a minimal risk of principal loss. Evidence of the Money Market Fund's conservative investment philosophy was that it held as its "benchmark" the rate of return for a 30-day U.S. Treasury Bill.

Despite its low-risk objectives, Brinson chose some investments for the Money Market Fund that were riskier than those usually associated with traditional money market funds such as unrated and low-rated debt instruments. One such investment

occurred on October 11, 2001, when Brinson purchased for the Money Market Fund an unsecured $20 million share of Enron debt know as a "loan participation." This loan participation was a riskier and more complex investment than the commercial paper in which money market funds typically invest in that it was unrated by any credit rating agency and that it was not liquid, meaning that it would have to be held until the loan reached maturity unless it could be sold to another investor. Maturity would never materialize as the $20 million loan participation would quickly prove worthless as Enron soon defaulted on November 29, 2001, as part of its rapid plunge into bankruptcy. This loss represented two percent of the Money Market Fund's total assets, which was highly unusual as such funds rarely suffer losses. Soon thereafter BP discharged Brinson as investment manager of its Money Market Fund.

Even though Enron's speedy downfall caught many in the financial community by surprise, Nelson contends that prior to Brinson's purchase of the Enron debt many warnings existed that should have alerted Brinson to its impropriety as an investment for the Money Market Fund. Nelson cites the following as "red flags" that should have dissuaded Brinson from investing in Enron: (1) The rampant insider selling at Enron that occurred in 2000 and early 2001; (2) the opaqueness of Enron's financial statements; (3) the unsatisfactorily-explained resignation of Enron President Jeffrey Skilling on August 15, 2001; (4) the increased price of an Enron credit protection

contract (a derivative instrument that provided insurance against an Enron default); and (5) the decline in Enron stock price over the course of 2001.

Nelson also asserts Brinson should have sold the Enron loan participation (even though it would have meant selling at a significant loss) prior to Enron's loan default based on the following occurrences: (1) Enron's October 16, 2001, announcement of a quarterly loss, its first in four years, after taking $1 billion in charges for poorly performing businesses; (2) the SEC's October 22, 2001, announcement that it had initiated an investigation into Enron; (3) Enron CFO Andrew Fastow's indictment and subsequent resignation on October 24, 2001; and (4) the late October lowering of Enron's investment value by various finance firms.

To support its assertion that Brinson's investment analyzation process was imprudent at the time the Enron loan participation was purchased, Nelson points to remedial measures that Brinson undertook in the wake of the Enron default. For instance, Brinson subsequently implemented "ratings screens" that sought to remove from its portfolio certain investments that could be prone to rapid devaluation.

In addition, Nelson contends that for the entire period in question Brinson operated under an undisclosed conflict of interest, namely Brinson's parent company's close relationship with Enron. Brinson's parent company, UBS, owned millions of shares of Enron stock, was one of its largest creditors and served as one of its main

financial advisors. Nelson avers that by investing in Enron's debt, Brinson did not act solely in the interest of the beneficiaries of the Plan.

Nelson filed the present lawsuit, on behalf of himself and other beneficiaries of the Plan, on September 12, 2003. Nelson's complaint alleges that Brinson violated various provisions of ERISA, particularly that Brinson breached its fiduciary duties of loyalty and care. Nelson seeks as restitution to the Plan the $20 million loss resulting from the Enron loan participation investment. Brinson now moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting Triad Assocs., Inc. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir. 1989)). A complaint need only specify "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002) (citing Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 863 (7th Cir. 2002)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). With these principles in mind, we now address the motion before us.

## DISCUSSION

Nelson brings his claims pursuant to 29 U.S.C. § 1104(a)(2) and 29 U.S.C. § 1109(a), which allow for an ERISA employee welfare benefit plan beneficiary or participant to sue a plan fiduciary, on behalf of the plan, for breach of fiduciary duty and recover losses resulting from such breach for the benefit of the plan. Among the fiduciary duties imposed by ERISA under the rubric of the "prudent man standard of care" are duties of loyalty, 29 U.S.C. § 1104(a)(1)(A), and duties of care or prudence, 29 U.S.C. § 1104(a)(1)(B). In order to properly state a claim for breach of fiduciary duty under ERISA, a plaintiff's complaint "must allege facts which set forth (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that a cognizable loss resulted." Herdrich v. Pegram, 154 F.3d 362, 369 (7th Cir. 1998), *rev'd on other grounds*, 530 U.S. 211 (2000). On the face of his complaint, it is clear that Nelson has sufficiently pleaded the first and third requisite elements: The complaint alleges that Brinson was a fiduciary of the Plan and its Money Market Fund and that a $20 million dollar loss to the Money Market Fund resulted from Brinson's decision to invest in Enron debt. The paramount question then, is whether Nelson has sufficiently alleged a breach of fiduciary duty so as to satisfy Federal Rule of Civil Procedure 8.

ERISA mandates that an employee welfare benefit plan fiduciary has a duty of loyalty which "is the most fundamental of his or her duties, and 'must be enforced with uncompromising rigidity.'" Herdrich at 371, *quoting* NLRB v. Amax Coal Co., 453 U.S. 322, 329-330 (1981). The relevant ERISA provision states that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). A fiduciary breaches this duty of loyalty "whenever it acts to benefit its own interests." Herdrich at 371. We find that Nelson's complaint sufficiently alleged that Brinson acted in its own interests by identifying the undisclosed (to the Plan) relationship between Brinson's corporate parent, UBS, and Enron. According to the complaint, Brinson's investment choice was motivated by its parent UBS' status as a large shareholder, creditor, and financial advisor of Enron. By alleging Brinson's desire to support Enron at a time when other investors were losing confidence in the energy trading firm, Brinson has advanced enough requisite facts to support an allegation that Brinson breached its fiduciary duty of loyalty.

A deeper inquiry is necessary to answer the question whether Nelson sufficiently pleaded Brinson's breach of its fiduciary duty of care. Under ERISA, a plan fiduciary must "discharge his duties . . . with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Nelson alleges that Brinson breached its duty of care by imprudently investing in the riskier Enron loan participation for the Plan's Money Market Fund when it should have selected only conservative and safer "money market grade" investments to meet its objective of a thirty-day Treasury note rate of return. Nelson also contends that Brinson breached its duty of care by not selling Enron's debt, even though it would have meant selling at a loss, once evidence of Enron's financial woes became more widely known to the investing community and the public. Brinson counters that hindsight is twenty-twenty and that there was nothing imprudent about its decision to invest in Enron, which before its rapid collapse was considered one of America's best performing corporations.

When analyzing claims for breach of fiduciary duty of care "the ultimate outcome of an investment is not proof of imprudence," DeBruyne v. The Equitable Life Assurance Soc. of the U.S., 920 F.2d 457, 465 (7th Cir. 1990), as the question is whether the investment "was prudent at the time it was made, not months or years later." Ossey v. Marolda, 1998 WL 67624, *5 (N.D. Ill. 1998). As Judge Bua so astutely observed, "the fiduciary duty of care requires prudence, not prescience."

DeBruyne v. The Equitable Life Assurance Soc. of the U.S., 720 F. Supp. 1342, 1349 (N.D. Ill. 1989).

The case giving rise to Judge Bua's remarks contained a factual posture that was rather similar to the lawsuit at hand. DeBruyne involved an employee benefit plan participant who sued the plan fiduciary under ERISA for breach of fiduciary duty of care for making imprudent investment decisions. The plan in question invested in what was described as a "Balanced Fund," which sought to achieve low volatility yet steady growth through a diversified portfolio of equity and debt securities. DeBruyne, 720 F. Supp. at 1345. While the Balanced Fund initially met its objectives and grew steadily, its value sharply declined following the "Black Monday" stock market crash of October 19, 1987. The DeBruyne plaintiff later sued the Balanced Fund's administrator under ERISA, alleging that it had breached its fiduciary duty of care by imprudently investing a disproportionate amount of the low-volatility Balanced Fund's assets in stocks, leaving it unprepared to face the plummet in stock prices that occurred on Black Monday. Id. at 1345-46. In awarding the defendants summary judgment, the DeBruyne court asserted that it could not "judge defendants' investment decision from the vantage point of hindsight" and must only "consider the prudence of defendants' conduct at the time they made the investments." Id. at 1348. The court then noted how the Black Monday crash caught the entire nation totally by surprise and that the

plaintiff could provide no evidence that, at the time of the crash, the Balanced Fund's equity-debt mix was inappropriate, especially considering the well-performing stock market of the mid-1980s. Id. at 1348-49.

As was the case in DeBruyne, Nelson's complaint involves an investment choice, Enron, that appeared wise to much of the financial community when made but that hindsight proved to be a poor decision. However, because the present lawsuit has not yet reached the summary judgment stage, it is important to note that Nelson must only *allege* imprudent investing by Brinson, not actually prove it. We find that Nelson has propounded sufficient facts to support a claim of breach of fiduciary duty of care. Unlike in DeBruyne, Nelson's complaint points to factors that relate to the wisdom of the Enron investment at the time it was made. It also alleges that Brinson failed to utilize investment screening procedures, which it later adopted, that could have prevented the purchase of portfolio assets that were susceptible to rapid devaluation. Even though Nelson's assertions that numerous warnings and "red flags" existed at the time of Brinson's purchase of Enron debt certainly do not prove imprudent investing in violation of ERISA, they are enough to advance a "*possible* claim." Herdrich, 254 F.3d at 369, *citing* Conley v. Gibson, 355 U.S. at 45-46 (emphasis in original). While also not necessarily supporting a "winning claim," id., Nelson's contentions that Brinson imprudently held on to the Enron investment, until the point of default, after

-10-

it became apparent that the company's death was imminent are also sufficient to bring a claim of breach of fiduciary duty of care.

Brinson also advocates dismissal of Nelson's complaint because it seeks the reimbursement of funds to Nelson's account. Such a personal award would be impermissible, as any recovery for breach of fiduciary duties under 29 U.S.C. § 1104(a)(2) and 29 U.S.C. § 1109 "goes to the plan as a whole and not an individual beneficiary." Anweiler v. Am. Elec. Power Serv. Corp., 3 F.3d 986, 992 (7th Cir. 1993). However, Nelson's complaint does not seek an individual recovery as his prayer for relief requests "a monetary payment from [Brinson] *to the Plan* to make good *to the Plan* the losses to the Plan resulting from the aforesaid breaches of fiduciary duties." Compl. at ¶ 45(1) (emphasis added). In any event, because courts have determined that ERISA claims for breach of fiduciary duty "should be read as if the claim was brought as a derivative action on behalf of the plan," Sack v. Seid, 2002 WL 1838153, *3 (N.D. Ill. 2002), we will read Nelson's complaint as one brought on behalf of the Plan. As such, any potential recovery in this action will "inure[] to the benefit of the plan as a whole." Massachusetts Life Ins. Co. v. Russell, 473 U.S. 134, 140 (1985).

Finally, Brinson maintains that Nelson's claim is not sustainable as a class action complaint. However, because Nelson has yet to seek class certification, we will reject Brinson's argument as premature.

### CONCLUSION

Based on the foregoing analysis, Brinson's motion to dismiss is denied.

_____
Charles P. Kocoras
Chief Judge
United States District Court

Dated: JAN 1 5 2004